Good morning, Your Honors. I'm Tim Dorr, counsel for the appellant K-4. This appeal involves the interpretation of 11 U.S.C. section 365-d3, particularly in light of this Court's ruling in the In Re Cougarman case. At stake are two administrative expense claims that K-4 sought as a landlord against a debtor Chapter 11 tenant. I guess the issue is whether these obligations arose before the rejection or some time later. That is the very precise issue, Your Honor. And with respect to the removal obligation, and this is the obligation where the building was taken off permissibly but all the area around it was not fixed, Midway's argument is based on specific language in the lease, and particularly upon the words, quote, upon termination or expiration. But a number of courts have followed what is referred to as the accrual approach, and it's the approach that this Court should follow. Even in the face of that expressed language? I think so, Your Honor. This Court has not directly faced the accrual approach issue. How do you accrue removing a concrete slab? Well, you don't, and that's exactly our argument. So how can the ---- It happens at a precise period of time, and the time was when the building was removed, clearly in the postpetition prerejection period. That's why we believe that it's entitled to an administrative expense. But I do think, you know, every type of claim is different. You have cases for rent. You have cases for taxes. You have all kinds of different cases. And really, if Section 365d3 is going to be a bright-line rule, like this Court said it should be in the Cougarman case, I think you have to look at this accrual approach, when in this time period did the obligations arise. And I think if you read Cougarman carefully, this Court did, in fact, indirectly follow the accrual approach in that case. The proof of claim that was submitted in that case was calculated using the accrual approach. It says so right in the case, and the Court took no issue with that. The Court also said in that case ---- That's true. But what the Court did is you don't know, actually, where the lease permission is in Cougarman. What the Court said is these payments at issue before us are ones that accrued during this period, and therefore, it's entitled to administrative expense. But in Cougarman, what they had done was they had tacked on to the rent payment for these additional promissory notes. And so what they were doing was getting ---- you had increased the rent, and our Court approves the increase in the rent, which compensates for the promissory notes that had been issued during the life of the lease. Now, if in Cougarman we had ---- the trustee had rejected the lease, then presumably the lessor would have lost all any accrued ---- any payments after the point of the rejection of the lease. Isn't that correct? In other words, if we tacked on an additional $100 a month to make a $100 payment towards our promissory ---- on our promissory notes, and had called it rent, and we had rejected the lease, then any payments still owed on the promissory notes after the rejection of the lease, the lessor would have to go back and stand in line along with everybody else. That's true with respect to any portion of the payment that was attributable after the rejection date. I mean, I think rent is the easy example ---- easiest example to start with. You know, typically rent is paid on the first day of the month for that month. And courts that use the accrual approach routinely say, look, if we follow in the middle of this thing, you still have to pay the rent for the post-petition period, even though technically the rent was due back on the first. If you file bankruptcy on the 15th, from the 15th to the 30th, that rent accrues during the post-petition period. That's the starting point for the accrual cases. They say, look, the lease defines which obligations have to be performed under Section 365d3. But the lease doesn't define. You don't look at the lease to see when the claims accrue. It's a common-sense approach. They're in there on the 16th, 17th, 18th of the month, and rent is the cost of occupancy. So it says you look at the lease to see which obligations have to be paid. Yes, rent is an obligation that's provided for in the lease. But you don't look at the lease to determine when it accrues. It's a practical approach, because the whole point of 365d3, the principle behind it, is that the landlord gets compensated for what occurs during the post-petition pre-rejection period. If I had a lease that said, for example, rent's payable quarterly in arrears, and I file bankruptcy on January 1st and reject the lease on March 30th, the court is not going to say under the accrual approach, just because that rent payment wasn't due until April 1, you're not entitled to any rent as an administrative expense from January 1st to March 30th. And so I think you have to divorce the concept of what's governed by the lease and what's governed by what actually occurs when these expenses actually crop up. That's the crux of this whole issue. And that's in part why I referred the Court to the recent national refractories case out of the Northern District of California, because it's a case that came out after this Court's decision in Kuckerman and tried to apply the principles to the very same types of claims that K-4 is making in this case. And the Court followed right along. It said, yes, that's right. Yes, you have to prove that it actually did accrue during this period, but if it did, that's what entitles you to an administrative expense. At what point, under your theory, then, at what point did the obligation to remove the slab accrue? It doesn't accrue over time. It surely accrues as of the time the lease is signed, as soon as they move into the building. They didn't lay the slab, did they? I'm sorry? The lessee didn't lay the slab here. Midway didn't lay the slab, did they?  I'll try to review the record. At what point did the obligation to remove the slab accrue? When the building was removed. When the what? When the building was removed. That's when it – because, look, they have a right to remove the building. When they remove the building, that's when the obligation crystallizes. And the reason that – Did they have an obligation to remove the building? Yes. So they were going to have to remove the building. They were. And they did remove the building. They did. They also had an obligation to remove the slab had the lease gone over the full life of the lease. And they did not remove the slab. They did not remove the slab. Your contention is they did half the job and didn't finish the job. Correct. Weren't they entitled to keep the slab and use it for, you know, skateboarding until the lease was expired or terminated? Yeah. They may have. I don't understand. I mean, the obligation to remove the slab came into being at the time the lease would have expired out of bankruptcy or was terminated as a result of the rejection. Well – I mean, they didn't have to remove the slab with the building, nor did they have to remove the building until the lease terminated or expired, did they? They didn't under the terms of the lease. But as I said, I don't think the terms of the lease govern the administrative expense analysis. And the only point I would say about the building, in response to the building coming on beforehand, is you have to be very careful, because if you go too far with that argument, basically every obligation in a lease becomes prepetition. I mean, their obligation to pay rent throughout the term also arose when they signed the lease. So I don't think that's the proper analysis when you're trying to pigeonhole a client. Could the building therefore have protected itself by demanding the payment of some kind of a bond, similar to a cleaning deposit up front, that would have a slab removal fee or something that would have been paid up front? Would that have protected you? Possibly, sure. I mean, they could have negotiated a number of deposits in order to get the time required. Including a payment per month that would go toward – that could be refunded at the end upon removal of the slab. Perhaps that could have been done. I'd like to reserve what little time I have for rebuttal. You may do so, counsel. Thank you. We'll hear from Mr. Doar. I'm Mr. Doar. It appears that our docket sheet has confused the attorneys for the parties. Mr. Doar, you do not represent Midway. Is that correct? I'm Mr. Doar and I do represent Midway. Well, okay. That's the problem. That's precisely the problem. Okay. Well, we'll just draw an arrow up here and we'll just reverse the arrangements. Okay. Thank you, Your Honors. For the record, I'm John Kaplan, appearing on behalf of TreeSource Industries, Inc., and its debtor subsidiary, Midway Engineered Wood Products, the tenants and the bankruptcy debtors in this case. I believe the Court's question was right on on the issue of the slab. It's basically a question of when did that accrue. The bankruptcy policy is that an administrative expense claim requires some benefit to the estate. There was not a benefit here. The exception to that general rule is contained in Section 365d3, which was enumerated further in the Kuckerman case. Section 365d3 specifically talks about maintaining obligations that arose under the lease during the post-petition, pre-petition period. This simply did not arise during that period, during the pre-rejection period. Why doesn't the obligation accrue at the time that Midway lays the slab? Because it's not ripe at that time, Your Honor. There's certainly no obligation for Midway to do anything further until it's through with the lease. And it's really a question of timing. It's one thing when Midway says, or the trustee says, maintaining this commercial lease is not in Midway's, is not in the interest of the estate, and therefore we're going to end the lease. At that point, Case 4 loses the benefit of having a tenant that makes monthly payments. But why should it suffer this block, this block insult of having to remove, to have to remove the slab? That's a one-time, end of the lease, whenever you leave, take the slab with you kind of obligation, as opposed to assuming the risk that your tenant may not be able to continue to make payments and Congress has allowed you to cancel the lease. But why do you lose the obligation to sort of clean up after yourself when you leave? The obligation doesn't go away, Your Honor. The question is, is that an obligation where the landlord needs to stand in line with every other creditor and obtain, in this case, approximately 30 cents on the dollar, or is this obligation somehow elevated to exalted status where it gets 100 percent paid? And what Congress decided to elevate to that particular status is only things that arise during that particular time period, post-petition and pre-rejection of the lease. Midway removed the building. Do they have an obligation to remove the building? That's the same obligation as the slab that is upon termination of the lease? That's correct, Your Honor. The lease stated they were obligated to remove the building and the slab at the end of the lease. Why did they remove the building? They removed the building because they believed it had some value to them elsewhere at one of the other tree source operations. Okay. So the building had some value after it was removed. It wasn't simply demolished. It was removed and sold for scrap or someplace else, but the slab obviously could not be moved. Yes, Your Honor, that's correct. And I believe it's consistent with bankruptcy policy, that there is an asset there that could be preserved for the benefit of the reorganized bankruptcy debtor, but that doesn't necessarily mean that the debtor needs to be tagged with an obligation where the landlord is essentially getting a windfall above the claim of a general and secured creditor. Could K-4 have protected itself here by, I'm asking the same question to you that I asked of Mr. Doar, could K-4 have protected itself here by demanding a slab deposit up front? Sure, just as in any other security deposit or bond or letter of credit. No claim on the deposit as assets of the estate. Right. There would be, you know, the issue comes up frequently. If the landlord has a pre-petition security deposit that can eventually be used to satisfy any, what would otherwise be a pre-petition unsecured claim in the bankruptcy case. It basically converts into a secured claim and would get it paid out of the deposit or the bond or deposit or letter of credit. K-4 could have protected itself by demanding money each month to go towards a slab removal. That's correct, Your Honor. Section 365. That's correct, Your Honor. And furthermore, I mean, if there were a monthly payment obligation, then that would fall within Section 365 D-3 as well. But there was not one in this case. The other issue is the maintenance obligation. That one is less clear cut, I'll acknowledge, than the slab, where it's very cut and dry from the language of the lease when it arises. But the lease also says that it's something that arises and must be cured upon termination. Mr. Doar did cite this case from the ñ this recent case from the Northern District of California. One difference in that case, there was clearly a record made of hazardous materials being brought onto the premises in that critical post-petition pre-rejection time period. In this particular case in the record, this particular subsidiary of TreeSource, Midway, was shut down basically at the time the debtors filed for bankruptcy several years earlier, had not been used. There's no logical reason to attribute wear and tear to the premises to the post-petition pre-rejection period. So not only is the record devoid of any evidence of anything accruing during that time period, it also states that there was no activity going on. So it begs the question, how is a ñ is a legal matter, could there have been anything that accrued during that particular period? Mr. Kaplan, how far does your principle carry you? If you had a commercial lease that obligated you to leave the premises room clean, okay, and you decided to reject the lease, can you just walk out and leave the trash on the floor and make the landlord come in and hire a crew to clean it up? You don't even have to satisfy the broom clean? Your Honor, that is ñ and this case may indicate to the contrary if there's evidence, but that generally is the majority viewpoint nationally, that that is the case, that in that situation the landlord's going to get stuck for it and what the landlord needs to do ñ Aside from Kuckermann, what other cases have you cited for us on that point? Well, Your Honor, there is a recent case out of the District of Delaware just from last month that we just located that I will ñ I will submit that. Okay. Are any of these really on point to the hypotheticals I've given you? There are such cases, Your Honor, that go to at least towards if there's an obligation to maintain the premises and the landlord comes in and complains afterwards, hey, the premises were left in a state of disarray, they were put in that state of disarray sometime during the post-bankruptcy but pre-rejection period where the courts have said, no, that's not the type of obligation that is encompassed within Section 365d3. I am not aware of any Ninth Circuit bankruptcy-level authority on that point. Is the Delaware case cited in your brief or did you provide a 28-J letter on that? No. I've ñ I will, Your Honor. You can take care of that today before you leave the courtroom, get the form from the Deputy Clerk and provide three copies for up here and a copy for your opponent. Thank you, Your Honor. I have nothing further unless the Court has further questions. No further questions. Mr. Doar, you have a little bit of time. Thank you, Your Honor. Just two quick factual points. The building that was removed did have substantial value, about $200,000 in value to Midway, and you'll find that at page ñ But the slab doesn't have any value. The slab does not. That's correct, at page 58 of the record. And I didn't get to speak as to the second part of the claim, the maintenance obligation, but I would point on that to the Court that the key words in that phrase, if you do decide that you go to the lease document, is that it's a keep-and-maintain obligation. It is not an obligation that only arose at the end of the lease. Mr. Doar, before you sit down, same question I asked Mr. Campbell right at the end. Do you have any ñ do you have any cases to be decided in your brief or that you can provide to the Court that indicate that when a commercial tenant leaves because they've rejected the lease, that they ñ that they still have an obligation to leave it, as I said, room clean, to mow the lawns, to take out the trash, to whatever, and can't just walk away from it? I don't have one off the top of my head. Thank you. Thank you very much. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Rymer, Bybee